**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID EHRLICH, SONG COLLECT, INC., d/b/a DME MANAGEMENT, and DAVID M. EHRLICH & ASSOCIATES,<br><br>　　　　　　　　　　　*Plaintiffs,*<br><br>　　　v.<br><br>LAUREN SPENCER SMITH,<br><br>　　　　　　　　　　　*Defendant.* | 23-cv-<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff David Ehrlich ("Ehrlich"), Song Collect, Inc. d/b/a DME Management ("DME Mgmt."), and David M. Ehrlich & Associates ("Ehrlich Firm", and collectively with Ehrlich and DME Mgmt., "Plaintiffs"), by their attorneys, Jonathan D. Davis, P.C., for their Complaint against Defendant Lauren Spencer Smith ("Ms. Spencer Smith" or "Defendant"), allege upon personal knowledge as to their own actions, and upon information and belief as to the actions of all others, as follows:

**PRELIMINARY STATEMENT**

1. This action arises from a junior record company executive's destructive acts to poison the successful management and attorney-client relationship between Mr. Ehrlich, a seasoned personal manager/attorney, and Ms. Spencer Smith, a young and rising recording artist/performer. Without cause or justification, Defendant materially breached and severed her contracts with Plaintiffs.

2. Ms. Spencer Smith is a pop singer who achieved celebrity after working only a few years under Mr. Ehrlich's supervision, guidance, and expertise.

3. The Ehrlich Firm is Mr. Ehrlich's law firm, and DME Mgmt. is his artist-management firm. Over the course of the parties' relationship, Defendant hired both firms to advance her entertainment career. But she abruptly terminated those contracts after Mr. Ehrlich's guidance enabled her to achieve her goal of becoming a "major" recording artist. As a consequence, Plaintiffs have sustained substantial damages, and Mr. Ehrlich has suffered loss of reputation in his trade, business, and profession.

4. But for the tortious acts of Jaclyn Pinsky, a young international marketing director at Universal Music Group ("UMG"), who had knowledge of Mr. Ehrlich's contracts with Plaintiff, Mr. Ehrlich would not have been fired from his positions as Ms. Spencer Smith's personal manager and co-entertainment lawyer, working alongside the well-established entertainment lawyer Doug Mark. Instead, Mr. Ehrlich would be enjoying the triumphs and rewards of his expert guidance of Defendant's entertainment career.

5. Mr. Ehrlich has many decades of experience representing groundbreaking and chart-topping recording artists and producers. His past and present clients and projects include those who have gone on to receive Grammy, Emmy, and Oscar recognition. His corporate clients include television production companies, record labels, and music publishers. Throughout his illustrious career, Mr. Ehrlich has straddled the worlds of talent, production, and technology, benefitting those whom he has served.

6. Working with Mr. Ehrlich, Defendant steadily increased her profile and songwriting abilities utilizing his extensive contacts, and Plaintiffs landed her a record-breaking recording deal with two of UMG's "major" record labels. UMG is a globally-recognized music and entertainment powerhouse.

7. The deal Mr. Ehrlich identified and negotiated for Defendant was so spectacular that it became the subject of numerous media articles, including in *Billboard* magazine, which is widely recognized as the most influential trade publication in the music industry.

8. Shortly after Mr. Ehrlich achieved this blockbuster deal for Ms. Spencer Smith, Ms. Pinsky set upon sabotaging the relationship, and intentionally procured the breach of Defendant's contracts with the Ehrlich Firm and DME Mgmt. Other parties may be complicit in Ms. Pinsky's misconduct.

9. Ms. Pinsky lured Ms. Spencer Smith into an unprofessional friendship while bypassing Mr. Ehrlich, excluding him from essential discussions, logistics, and planning. Then, she took risks with Ms. Spencer Smith's career and well-being by exposing her to situations that compromised her readiness for events and endangered her voice for key promotional opportunities in Europe. Ms. Pinsky was also not mindful of Ms. Spencer Smith's personal safety.

10. In a professional and respectful way, Mr. Ehrlich raised concerns to protect his client from Ms. Pinsky's misdirected influence. He also notified – in real time – senior executives at UMG and his co-entertainment lawyer, Mr. Mark, about the substantial harm that Ms. Pinsky was causing to his relationships with Ms. Spencer Smith.

11. Ms. Pinsky retaliated against Mr. Ehrlich by demonizing him to UMG and others, seizing upon a handful of innocuous interactions, about which neither Defendant nor anyone else at UMG had ever complained. Mr. Mark, in consultation with his wife, advised and counseled Mr. Ehrlich through this period, recognizing both in conversations and electronic communications that he was being falsely accused.

12. Ms. Pinsky claimed that Mr. Ehrlich had made her feel "uncomfortable" and that he "berated" her. Mr. Ehrlich was bushwhacked by her vague and unspecified comments, especially

in the *#MeToo* cultural context where accusations, however unsubstantiated, can be enough to cost individuals their livelihoods and reputations. Ironically, Ms. Pinsky was never alone with Mr. Ehrlich or the subject of any one-to-one communications. Yet her smear campaign succeeded, inducing Ms. Spencer Smith to fire Plaintiffs on May 13, 2022. In or about November 2022, Ms. Pinsky left UMG.

13. After Plaintiffs' termination by Ms. Spencer Smith, Andrew Gertler and Ziggy Chariton of Andrew Gertler Artists, LLC ("AGA"), swooped in to become her personal management firm, all the while knowing Defendant was subject to binding written contracts with Plaintiffs. Gertler and Chariton are no strangers to UMG; the former is the manager to superstar Shawn Mendes (who is coincidentally signed to Island Records like Defendant), and the latter is a former UMG employee and current member of AGA.

14. Defendant is now attempting to force Mr. Ehrlich into giving up the substantial compensation and post-term payouts to which he is entitled under their written contracts. For months, she has threatened to file a baseless lawsuit against Plaintiffs built on lies and defamation concerning his purported "disrespectful behavior" and unidentified "inappropriate sexual behaviors" towards others, all predicated on Ms. Pinsky's smear campaign.

15. Mr. Ehrlich's chronicling of Defendant's day-to-day public activities with his iPhone for archival and potential promotional purposes is being twisted and opportunistically weaponized by Defendant into a make-believe *#MeToo* gotcha, so she can escape her binding written contracts with Plaintiffs.

16. Defendant has embellished her charade of a legal defense by now inaccurately alleging that Mr. Ehrlich engaged in unethical conduct by serving as both her personal manager and co-entertainment lawyer with Mr. Mark, who himself owed independent fiduciary duties to

Defendant. In New York, lawyers serving as both lawyer and manager is ethically and legally permissible like other jurisdictions. Some of the most well-known artists have been represented by lawyers acting in both legal and management capacities, including Eminem, Imagine Dragons, Doja Cat, and Michael Jackson. In addition, Mr. Ehrlich was always protective of Defendant's rights and interests, as he insisted that she have separate legal counsel to negotiate the management agreement and encouraged her to have full-time co-entertainment counsel, as she did, serving with him.

17. Defendant's new theory regarding the contractual arrangements between Plaintiffs and Defendant has been contrived because she recognized that her *#MeToo* defense was insupportable, and she was desperate for any means of deterring Mr. Ehrlich from suing Defendant for her unlawful conduct. With Mr. Ehrlich out of the way, Defendant sought to create the pathway for Mr. Mark and AGA to reap the benefits and rewards of Mr. Ehrlich's hard work.

## PARTIES

18. Plaintiff Ehrlich is a citizen of the State of New York, residing in New York City.

19. Plaintiff DME Mgmt. is a citizen of the State of New York, having its incorporation and principal place of business in the State of New York.

20. The Ehrlich Firm is a citizen of the State of New York, having its place of organization and principal place of business in the State of New York.

21. Defendant is a citizen of the United Kingdom, residing in British Columbia, Canada.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2).

23. The amount in controversy in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

24. The venue of this action is properly found in this judicial district under 28 U.S.C. § 1391(b)(2).

25. Section 13(a) of the Management Agreement (defined below) provides that "[a]ny controversy[] or claim arising out of or relating to any provision of this Agreement, or the breach thereof, shall be brought in the State or Federal Courts located in New York County, New York, and not elsewhere."

26. Section 4 of the Engagement Agreement (defined below) provides, in relevant part, that "[i]f court actions or proceedings are commenced as a result of any controversies and disputes arising from or relating to this Agreement or the subject matter thereof, the federal and state courts located within New York County, State of New York shall have the exclusive jurisdiction over any and all such proceedings."

27. And, Plaintiffs and Defendant agreed by amended letter, dated as of August 19, 2022, that "the United States District Court for the Southern District of New York shall have exclusive jurisdiction and venue over any lawsuit concerning the Parties' business relationship and each Party waives any objection which she, he, it, or they have based on lack of jurisdiction, improper venue, or forum non-conveniens, unless the Parties otherwise mutually agree."

## **BACKGROUND**

28. Mr. Ehrlich has deep experience in the music industry. Among other accomplishments, he has spent the past three decades representing leading artists as their attorney and/or personal manager. He also served as a senior executive at Priority Records, and as an A&R consultant to Universal Records.

29. Mr. Ehrlich's clients have included groundbreaking members of the hip hop group Wu Tang Clan, the multi-platinum rock band Nickelback, superstar producer "Danja," and, most recently, Defendant.

30. Mr. Ehrlich operates his legal practice through the Ehrlich Firm and manages artists through DME Mgmt.

**A.  The Parties' Introduction**

31. Mr. Ehrlich met Defendant in 2019 on the set of the popular *American Idol* television series where she was a contestant. Even though Ms. Spencer Smith failed to reach the Top 10 during her season, Mr. Ehrlich recognized Defendant's potential and believed that he could help her become a superstar, as he had done with other artists in the past.

32. After conversations with Defendant and her parents, Defendant hired the Ehrlich Firm in 2019 as her entertainment lawyers. She is subject to a successor engagement agreement, dated April 17, 2020 (the "Engagement Agreement").

33. Ms. Spencer Smith hired DME Mgmt. as her full-time personal managers approximately nine months later under the Management Agreement, dated January 1, 2021 (the "Management Agreement"). That agreement was later ratified by Defendant when she was 18-years old.

34. In connection with the Management Agreement, Defendant was independently represented by Jonathan Horn, a well-respected and experienced New York entertainment lawyer. He counseled Ms. Spencer Smith about that personal service agreement, which contained fair and customary terms in the music industry, in conjunction with his review and consideration of the existing Engagement Agreement.

35. Doug Mark thereafter became co-entertainment lawyer with the Ehrlich Firm, without any additional cost to Defendant. He would be compensated under the fee arrangement Mr. Ehrlich established under the Engagement Agreement. Defendant approved the engagement and payment arrangement in writing.

**B.  <u>The Signed Written Agreements</u>**

**(i)  <u>The Engagement Agreement</u>**

36. Under the Engagement Agreement, Ms. Spencer Smith hired the Ehrlich Firm as her attorneys "generally in connection with [her] career in the entertainment industry."

37. The Ehrlich Firm is entitled to legal fees under Section 2. Among other provisions, Defendant agreed to pay 5% "of all gross monies and any other compensation earned or received by [her] or payable to [her]…as a result of [her] Entertainment Services."

38. "Entertainment Services" is defined as Defendant's "services and activities throughout the entertainment industry" including, *inter alia*, her work as "a recording artist" and "song writer."

39. For agreements that Ms. Spencer Smith entered into "for [her] Entertainment Services," such as "a recording agreement with a major record label" or a "publishing agreement," the Ehrlich Firm is "entitled to a *success fee*" of 10% of compensation received "in the first year from [the] agreement," after which this fee reverts back to 5%. (Emphasis added.)

40. Defendant agreed to pay the Ehrlich Firm, "irrespective of the termination of [the] relationship, and such shall [be] payable for as long as [Defendant] receive[s] payment pursuant to those agreements and materials which generate income. Provided however, with respect to agreements concerning music materials (*i.e.*, songs and recordings), [the] Fee shall apply to those materials created prior to and during the term of [the] Agreement (or if not materials created Gross Compensation for the current and/or our negotiated renewal term pursuant to such an agreement)

8

and within three (3) months thereafter." As to "Related Agreements, [the] Fee shall apply to Gross Compensation received with respect to such Related Agreements, irrespective of whether the Firm still represents you."

41. The Engagement Agreement requires payment "at the same time as the corresponding payments are paid to [Defendant] or on [her] behalf," provided that she "shall pay [the Ehrlich Firm] no later than every 30 days" with twelve per cent interest per annum thereafter under Section 3.

42. Section 4 provides that although either party may "terminate this Agreement at any time," Defendant "shall remain obligated to pay to the Firm any Fees owed to the Firm under the terms hereof including, but not limited to, payments or accounts made to [her] after [the Firm's] termination."

**(ii) <u>The Management Agreement</u>**

43. Under Section 1 of the Management Agreement, DME Mgmt. became Defendant's "exclusive personal manager throughout the world in connection with all of [her] services and activities throughout the entertainment industry."

44. Under Section 2, the term of the Management Agreement commenced January 1, 2021 and continues "for a period of five (5) years (the 'Term')." If "the expiration date of the [Management] Agreement shall fall either sixty (60) days prior to or after the scheduled release of a single or album by [Defendant], th[e] Agreement shall be extended for an additional six (6) months from the expiration date."

45. Section 3 establishes DME Mgmt.'s management "commission." It provides, among other things:

(a) In Section 3(b), Defendant shall pay DME Mgmt. a "commission" of "fifteen percent (15%) of [her] Gross Income." Section 3(d) defines Gross Income as "all earnings … reasonably related to the Entertainment Services and Artist's career .…"

(b) Under Section 3(c)(i), the "commission" is payable, subject to Section 3(c)(ii), "in perpetuity and without reduction regardless of when … Gross Income is earned and/or received in respect of recordings, musical compositions and other intellectual properties which are the product of your Entertainment Services."

(c) Section 3(c)(ii) requires the payment of the commission "in perpetuity and without reduction regardless of when … Gross Income is earned and/or received in respect of any service agreements in connection with your Entertainment Services … which agreements are entered into or substantially negotiated … during the Term and, in the case of the latter, actually concluded within six (6) months after the Term, and those agreements which are extensions, renewals, modifications and/or replacements of any of such agreements …."

(d) Under Section 3(c)(iii), "[w]ith respect to Gross Income derived from recordings and musical compositions which are created by you during the Term hereof, and are first exploited following

10

the end of the Term, Manager shall be paid a commission"
according to a schedule set forth in the Agreement, *which is on
a declining commission percentage and shall not exceed 15
years*.

46. Section 4 provides for payment of DME Mgmt.'s expenses, as amended on April 6,
2022.

47. Section 5 requires payment of DME Mgmt.'s "share of Gross Income, any approved
expenses … and/or recoupment of advances, on or before the fifteenth (15th) day of each calendar
month during the Term and thereafter so long as Manager is entitled to receive commissions
hereunder. Notwithstanding the foregoing Manager shall have the right to receive its commission
simultaneously but no less than seven (7) business days after [Defendant] receives Gross Income."

## C.  Mr. Ehrlich's Management of Defendant

48. From the start, Mr. Ehrlich invested a substantial amount of time in Defendant's career.
Ms. Spencer Smith and Mr. Ehrlich quickly developed a close, professional, and respectful
working relationship.

49. Ms. Spencer Smith frequently acknowledged Mr. Ehrlich's singlemindedness
regarding her career development and advancement. She often remarked how lucky she was to
have his knowledge and insight on her side.

50. Defendant's parents expressed similar gratitude, as they assiduously followed their
daughter's career enhancement. They also frequently expressed their comfort in knowing that
Defendant was in Mr. Ehrlich's experienced and caring hands.

51. Among multiple other services and activities he performed, Mr. Ehrlich helped
Defendant develop her songwriting abilities, introduced her to his extensive music industry

contacts, and guided a string of successful, independently released singles embodying her vocal performances. Mr. Ehrlich simultaneously engaged in A&R, promotion, marketing, and publicity for the release of the singles, as Defendant was completely inexperienced in these areas.

52. Mr. Ehrlich's efforts culminated in the January 2022 release of the single "Fingers Crossed" on iTunes and Spotify. Mr. Ehrlich not only set up the introduction of Defendant with the songwriter of the single, but also performed the A&R function, approved the mix, and marketed and promoted the record.

53. The single became a global hit, debuting at No. 1 on iTunes and in the Top 10 on Spotify worldwide, making Defendant an instant international music sensation. The song was picked up by a number of Top 10 radio stations, and also became a Top 40 hit. This evolution was ground-breaking for an independently released song.

54. With the enormous buzz from that one single release, Mr. Ehrlich tapped into his music network to create a bidding war for Defendant's exclusive recording services. In February-March 2022, he ultimately landed Ms. Spencer Smith a lucrative and historic label partnership with UMG's Island Records and Republic Records.

55. Defendant's record deal was unique, insofar as she was simultaneously signed by two "major" record labels. Mr. Ehrlich engineered it that way so Defendant could benefit from the firepower, talent, and leverage each label had to offer, aligning Defendant with Island Records CEO Imran Majid and Justin Eshak, Republic Records founders Monte and Avery Lipman, and Lucian Grainge, Chairman and CEO of UMG.

56. Avery Lipman, founder and COO of Republic Records, stated the following about Defendant's deal in a March 1, 2022 *Billboard* article: "We're thrilled with this unique opportunity to join forces with Imran, Justin and their team at Island Records … Lauren's a phenomenal

songwriter with a powerful voice and incredible creative intuition. Together, with her manager David Ehrlich, we look forward to giving her the biggest platform possible."

57. In praise of Mr. Ehrlich, Defendant credited him with "saving her life," making her "dreams come true," and other flattering tributes which she voiced time and again, both to him privately and in the presence of others.

### D.  Ms. Pinsky Tortiously Interfered with Mr. Ehrlich's Agreements

58. Shortly after Mr. Ehrlich landed this blockbuster music deal for Defendant, Ms. Pinsky began to interfere with and destroy the successful business relationship between Defendant and Plaintiffs.

59. Ms. Pinsky was assigned by UMG to work with Ms. Spencer Smith on international marketing. Almost from the start, she flouted industry custom and practice concerning the conventional relationship among label, artist, and personal manager.

60. Within the music industry, it is policy and protocol that communications between the record label and the artist travel through the artist's personal manager. A personal manager is the conduit between the artist and everyone else as a matter of prudence and protection.

61. Among other things, Ms. Pinsky frequently worked behind Mr. Ehrlich's back; lied to him about Defendant's arrangements and logistics; endangered Defendant's singing voice and readiness; and demonstrated inexperience in her responsibilities that damaged Defendant's developing brand. Her conduct was contrary to the best interests of Defendant.

62. Beginning in March 2022, Ms. Pinsky began having inappropriate conversations, meetings, and dinners with Defendant. These private dealings were subsequently revealed to Mr. Ehrlich by Defendant and others who were informed about them. Plaintiff complained about Ms.

Pinsky's conduct to Island Record's marketing head, Sharon Timure, who apologized to Mr. Ehrlich and promised it would be addressed and discontinued.

63. Shortly thereafter, UMG arranged a European promotional tour for Defendant that was scheduled for April-May 2022. Both during its planning stages, and during the trip itself, Ms. Pinsky continued communicating privately with Defendant about itineraries, travel arrangements, and other management topics, excluding Mr. Ehrlich.

64. After Defendant, Mr. Ehrlich, and the UMG team arrived in Europe for the promotional tour, Mr. Ehrlich received infrequent communications from Ms. Pinsky; she excluded him from meetings; lied to him about travel arrangements; and she misled or omitted telling him about events. For example, she arranged multiple dinners, including in Sweden and Paris with local record label personnel, Defendant, and her travel party, but excluded Mr. Ehrlich from those activities.

65. Without Mr. Ehrlich's knowledge or input, Ms. Pinsky also lured Defendant into expensive shopping trips and encouraged her to purchase extravagant luxury goods. Such enticements were hard for Defendant to resist, as Defendant came from a modest background and never was faced with managing significant financial resources. She was easily swayed in such intoxicating venues and spent thousands of dollars with Ms. Pinsky's encouragement and without Mr. Ehrlich's input concerning the effects of such purchases on her finances.

66. Ms. Pinsky also invited Defendant out to socialize in clubs and bars, which was not in Defendant's best interests at this early stage of her career. Defendant tended to lose her voice if overworked from loud talking and late nights. Mr. Ehrlich was cognizant of this fact. Ms. Pinsky was oblivious to it. At the beginning of the management relationship, Defendant was insistent that Mr. Ehrlich protect her voice by giving her sufficient rest and avoiding raucous spaces. Club and

bar scenes were supposed to be off limits while she was working, especially because Ms. Spencer Smith blamed her early exit from the *American Idol* competition, in part, on her failure to safeguard her voice.

67. When Ms. Pinsky continued to ignore Mr. Ehrlich's concerns, Mr. Ehrlich raised the issue of her unhelpful and unprofessional actions with Mike Alexander, Island Records' General Manager, because it was materially interfering with his personal management and placing Defendant's career in jeopardy. Mr. Alexander acknowledged Ms. Pinsky's disregard for policy and protocol and promised that he would discuss it with her and correct these improper activities. Mr. Ehrlich also raised these issues with co-entertainment lawyer Doug Mark, who also found Ms. Pinsky's behavior irregular and interfering. Mr. Ehrlich and Mr. Mark spoke and texted frequently trying to devise a strategy that would respectfully end the problem and distraction from the true business at hand: developing and maturing Defendant as a recording artist and performer.

68. After repeated late-night calls and texts between Mr. Ehrlich and Mr. Alexander, it was decided that Mr. Alexander would discuss Ms. Pinsky's misconduct in person with her, as he was scheduled to join Defendant's promotional tour in London.

69. At a meeting on May 1, 2022, in their London hotel lobby, Mr. Ehrlich, Mr. Alexander, and Ms. Pinsky discussed, in a positive and composed manner, the recurring issues that concerned Mr. Ehrlich. That meeting seemingly cleared the air – at least that is what Mr. Ehrlich believed. Indeed, Ms. Pinsky appeared to genuinely apologize to Mr. Ehrlich.

70. But approximately a half hour after their meeting, Ms. Pinsky falsely claimed, for the first time, in a telephone call to the label executives in New York that Mr. Ehrlich was "inappropriate" and made her feel "uncomfortable." This made no sense because Ms. Pinsky was

never alone with Mr. Ehrlich and she had always limited their interactions by keeping him uninformed about the schedule for Defendant.

71. Ms. Pinsky's purported discomfort was undoubtedly part of her campaign to "cancel" Mr. Ehrlich. She retaliated against him by recharacterizing a handful of benign occurrences, about which no one complained, to sow Defendant's distrust in Mr. Ehrlich. After the call to New York, UMG directed Ms. Pinsky to return home immediately.

72. In the more than two plus years that Mr. Ehrlich worked with Defendant, no one had ever complained about his behavior or actions in connection with her career, including Defendant, her family, and the musicians, producers, videographers, lawyers, record label executives and staff around her.

73. To the contrary, Defendant and her family were deeply appreciative of Mr. Ehrlich's advice and guidance and everything he had helped her accomplish in such a short period. In contrast, Mr. Ehrlich was constantly navigating Defendant's propensity to conduct business herself and her penchant for being easily manipulated by third parties. Defendant was not worldly or sensitive to matters that would be obvious to others.

74. Ms. Pinsky's primary complaint against Mr. Ehrlich was apparently that he took photographs during the European tour, some of which depicted females with whom Defendant and her travel team interacted during promotional events or travel. Ms. Pinsky falsely insinuated that they were in some way sexually exploitative. They were nothing of the sort; as Defendant's personal manager, Mr. Ehrlich always chronicled Defendant's travels and work for archival and potential promotional purposes. No one ever expressed concerns about what he did and all such photographs will become a part of the record in this lawsuit.

75. Chronicling Defendant was standard operating procedure for Mr. Ehrlich, and it was highly beneficial because, before promotional activities began with UMG, Defendant did not have a photographer or videographer trailing her 24/7.

76. Although a videographer was present on the European promotional tour, Mr. Ehrlich continued to chronicle Defendant's days for archival and potential promotional purposes. Only Ms. Pinsky voiced any objection to those photographs, *and only after their May 1, 2022 meeting with Mr. Alexander*. And because Defendant and her team encountered males and females alike – fans, friends, musicians, record company employees, and airline and hotel staff – his photographs invariably included them.

77. Defendant posted multiple videos of the European promotional tour to her social media pages, which have tens of thousands of subscribers. The videos are from the same promotional tour that Mr. Ehrlich chronicled, depicting female fans, musicians, record company employees and others, including Ms. Pinsky. These videos are available to anyone with access to the Internet. None of them are compromising or private, just as none of Mr. Ehrlich's photographs are of that sort.

78. To Mr. Ehrlich's knowledge and belief, no one but Ms. Pinsky ever complained about his photographs, as it is commonplace in the entertainment industry to document an artist's travels and activities. A personal manager has the most access to the artist and can help feed the client's constant promotional needs.

79. Ms. Pinsky's other complaints were equally manufactured. On April 29, 2022, after returning his exhausted artist to the hotel after a lengthy and late dinner with UMG executives at a popular club, Mr. Ehrlich returned to the club and calmly spoke to Ms. Pinsky about improving their communication and working relationship. After that talk, Ms. Pinsky apparently falsely

claimed to Defendant that he "berated" her. Mr. Ehrlich had done no such thing, and, in fact, was simply doing the job Defendant hired him to do – act as her personal manager and protector.

80. On May 6, 2022, several days after Ms. Pinsky made her false complaints to New York, Defendant and her mother met with Mr. Ehrlich and acknowledged that he had done nothing wrong and expressed their continued support for him. There was no discussion of either suspending or terminating his services as personal manager or co-entertainment lawyer.

**E.  Defendant Wrongfully Terminated the Agreements**

81. About a week after Ms. Pinsky reported to UMG her discomfort with Mr. Ehrlich, many of the same unfounded complaints appeared in a termination letter he received from Defendant.

82. The one-page May 13, 2022 termination letter neither explains how any contractual provision of their contracts was breached by Mr. Ehrlich, except for vague catchphrases, nor does it supply any valid legal basis for terminating either the Management Agreement or the Engagement Agreement.

83. Defendant merely regurgitated Ms. Pinsky's falsehoods and accepted that she was entitled to walk away from her written contracts with Mr. Ehrlich's firms. Defendant also, for the first time, claimed to be concerned about and uncomfortable with past events about which she had never complained before, including Mr. Ehrlich's photography and purported "disrespectful behavior" towards Ms. Pinsky.

84. Ms. Pinsky's smear campaign succeeded based on lies and deceptions, causing Defendant to wrongfully terminate her binding contracts with DME Mgmt. and the Ehrlich Firm.

**COUNT I**
**(Breach of the Management Agreement)**

85. Plaintiff DME Mgmt. repeats and realleges paragraphs 1 through 84 as if fully set forth at length herein.

18

86. DME Mgmt. has fully performed its obligations to Defendant under the Management Agreement.

87. Defendant has materially breached her obligations under the Management Agreement. For example, Defendant materially breached the Management Agreement by purporting to terminate it prior to the end of its Term, and failing to pay management commissions owed during the Term and/or as otherwise provided under the Management Agreement.

88. Despite providing Defendant with notice of her material breaches of the Management Agreement on June 1, 2022, she has failed to cure them.

89. Defendant's material breaches have deprived DME Mgmt. of its management commissions and other benefits under the Management Agreement, and Defendant's breaches will continue to deny DME Mgmt. its rights thereunder.

90. DME Mgmt. has been damaged, and will continue to be damaged, by reason of Defendant's material breaches of the Management Agreement.

91. Accordingly, DME Mgmt. demands judgment against Defendant in an amount to be determined at trial, but not less than $10,000,000.

<u>**COUNT II**</u>
**(Breach of the Engagement Agreement)**

92. Plaintiff Ehrlich Firm repeats and realleges paragraphs 1 through 91 as if fully set forth at length herein.

93. The Ehrlich Firm has fully performed its obligations to Defendant under the Engagement Agreement.

94. Defendant has materially breached her obligations under the Engagement Agreement. For example, Defendant has failed and refused to pay outstanding legal fees and costs, as well as the continued payments required by Sections 2 and 4 thereof.

95. The Ehrlich Firm has been damaged, and will continue to be damaged, by reason of Defendant's material breaches of the Engagement Agreement.

96. Accordingly, the Ehrlich Firm demands judgment against Defendant in an amount to be determined at trial, but not less than $5,000,000.

<u>**COUNT III**</u>
**(Declaratory Judgment with respect to the Management Agreement)**

97. Plaintiffs DME Mgmt. repeats and realleges paragraphs 1 through 96 as if fully set forth at length herein.

98. An actual and justiciable controversy exists between DME Mgmt., on the one hand, and Defendant, on the other hand, such that DME Mgmt. requests this Court to declare, among other things, that the Management Agreement is a valid, binding, and enforceable agreement through its full term and with respect to all post-term obligations and rights that Defendant owes to DME Mgmt.

99. In particular, the Court should declare, among other things, that:

(a) the Management Agreement continues "for a period of five (5) years" … but if "the expiration date of the [Management] Agreement shall fall either sixty (60) days prior to or after the scheduled release of a single or album by [Defendant], th[e] Agreement shall be extended for an additional six (6) months from the expiration date";

(b) DME Mgmt. is entitled to a management "commission" of "fifteen percent (15%) of [Defendant's] Gross Income," which consists of "all earnings … reasonably related to the Entertainment Services and Artist's career";

(c) the management "commission" is payable, subject to Section 3(c)(ii), "in perpetuity and without reduction regardless of when … Gross Income is earned and/or received in respect of recordings, musical compositions and other intellectual properties which are the product of [Defendant's] Entertainment Services";

(d) the management commission is payable "in perpetuity and without reduction regardless of when … Gross Income is earned and/or received in respect of any service agreements in connection with [Defendant's] Entertainment Services … which agreements are entered into or substantially negotiated … during the Term and, in the case of the latter, actually concluded within six (6) months after the Term, and those agreements which are extensions, renewals, modifications and/or replacements of any of such agreements";

(e) "[w]ith respect to Gross Income derived from recordings and musical compositions which are created by [Defendant] during the Term hereof, and are first exploited following the end of the Term, Manager shall be paid a commission" according to a schedule, which shall not exceed 15 years;

(f) DME Mgmt. shall be paid its expenses, as amended on April 6, 2022; and

(g) DME Mgmt.'s "share of Gross Income, any approved expenses

… and/or recoupment of advances" shall be paid "on or before the fifteenth (15th) day of each calendar month during the Term and thereafter so long as Manager is entitled to receive commissions … but no less than seven (7) business days after [Defendant] receives Gross Income."

100.   A declaration by this Court is necessary and vital to determine and validate the rights and interests of DME Mgmt. and to compel enforcement of the Management Agreement now and into the future to prevent Plaintiffs from having to sue for any subsequent breaches of those agreements.

101.   DME Mgmt. has no adequate remedy at law.

102.   Accordingly, DME Mgmt. requests a declaratory judgment validating its rights and interests in the Management Agreement and compelling the enforcement of that agreement under its terms.

## <u>COUNT IV</u>
### (Declaratory Judgment with respect to the Engagement Agreement)

103.   Plaintiff Ehrlich Firm repeats and realleges paragraphs 1 through 102 as if fully set forth at length herein.

104.   An actual and justiciable controversy exists between the Ehrlich Firm, on the one hand, and Defendant, on the other hand, such that the Ehrlich Firm requests this Court to declare, among other things, that the Engagement Agreement is a valid, binding, and enforceable agreement.

105.   In particular, the Court should declare that the Ehrlich Firm is entitled, among other things, to:

(a) 5% of "all gross monies and any other compensation earned or

received by [Defendant] or payable to [her] … as a result of [her] Entertainment Services";

(b) a "success fee" of 10% of compensation received "in the first year from" any such agreements, including a "recording agreement with a major record label" or a "publishing agreement," and thereafter the fee is restored to 5%;

(c) payments "no less than every 30 days"; and

(d) "Fees owed to the Firm under the terms hereof including, but not limited to, payments or accounts made to [her] after [the Ehrlich Firm's] termination."

106.   A declaration by this Court is necessary and vital to determine and validate the rights and interests of the Ehrlich Firm and to compel enforcement of the Engagement Agreement now and into the future to prevent Plaintiffs from having to sue for any subsequent breaches of those agreements.

107.   The Ehrlich Firm has no adequate remedy at law.

108.   Accordingly, the Ehrlich Firm requests a declaratory judgment validating its rights and interests in the Engagement Agreement and compelling the enforcement of that agreement under its terms.

## <u>COUNT V</u>
### (Defamation *Per Se*)

109.   Plaintiff Ehrlich repeats and realleges paragraphs 1 through 108 as if fully set forth at length herein.

110.   Defendant repeated statements to Ms. Pinsky, Imran Majid, and other UMG representatives in London, England, New York, and elsewhere, over several days in May 2022,

that Mr. Ehrlich committed exploitative misconduct in connection with his participation in the European promotional tour (the "<u>Defamatory Statements</u>").

111.  Defendant communicated these falsehoods even though she knew them to be untrue when she made the Defamatory Statements.

112.  Mr. Ehrlich did not commit any sexually exploitative misconduct. Defendant repeated these accusations to third parties, including her parents, executives at Island Records and Republic Records,  and UMG, at the urging and direction of Ms. Pinsky in retaliation for the legitimate concerns Mr. Ehrlich raised about Ms. Pinsky and her conduct around Defendant.

113.  The Defamatory Statements are untrue and expose Mr. Ehrlich to hatred, contempt, or aversion, or induce an evil or unsavory opinion of Mr. Ehrlich in the minds of Defendant's parents, executives at Island Records, Republic Records and UMG, and other third parties in the music industry.

114.  The Defamatory Statements, which are about Mr. Ehrlich, were published without privilege or authorization.

115.  In publishing the Defamatory Statements, Defendant acted, at a minimum, in a negligent manner.

116.  Ms. Pinsky knew the detrimental and negative impact the Defamatory Statements would have on Mr. Ehrlich's reputation in his trade, business, and profession.

117.  Because Defendant accused Mr. Ehrlich of sexually exploitative misconduct, in a manner that would injure Mr. Ehrlich in his trade, business, and profession, the Defamatory Statements are defamatory *per se*.

118.  These acts have caused, and will continue to cause, damage to Mr. Ehrlich, including, without limitation, in the form of lost revenues from the termination of the Engagement Agreement

and Management Agreement, lost earning capacity, and the reasonable expectation of the loss of current and/or future clients.

119.  Mr. Ehrlich has suffered and will continue to suffer non-economic damages, including emotional distress, humiliation, anxiety, mental suffering, and harm to reputation and standing in the community.

120.  Mr. Ehrlich demands judgment against Defendant in an amount to be determined at trial, but not less than $25,000,000, and punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant, as follows:

(a)  On Count I for breach of the Management Agreement, damages in an amount to be determined at trial, but not less than $10,000,000;

(b)  On Count II for breach of the Engagement Agreement, damages in an amount to be determined at trial, but not less than $5,000,000;

(c)  On Count III for declaratory relief, a judgment declaring the rights and interests of the parties under the Management Agreement;

(d)  On Count IV for declaratory relief, a judgment declaring the rights and interests of the parties under the Engagement Agreement;

(e)  On Count V for defamation *per se*, damages in an amount to be determined at trial, but not less than $25,000,000, and punitive damages;

(f)  Interest, costs and attorney's fees as permitted by applicable contract, law, or statute; and

(g) Such other and further relief as the Court deems just and proper.

Dated:  March 30, 2023
    New York, New York

                      JONATHAN D. DAVIS, P.C.

By:                               
                      Jonathan D. Davis
                      1 Rockefeller Plaza, Suite 1712
                      New York, NY 10020
                      (212) 687-5464
                      *jdd@jddavispc.com*

                      *Attorneys for Plaintiffs David Ehrlich, Song*
                      *Collect, Inc. d/b/a DME Management, and*
                      *David M. Ehrlich & Associates*

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

Dated: March 30, 2023
       New York, New York

                          JONATHAN D. DAVIS, P.C.

By: _____
                Jonathan D. Davis
                1 Rockefeller Plaza, Suite 1712
                New York, NY 10020
                (212) 687-5464
                *jdd@jddavispc.com*

                *Attorneys for Plaintiffs David Ehrlich, Song Collect, Inc. d/b/a DME Management, and David M. Ehrlich & Associates*